15 APR -1  PM 12: 45

DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL EDWARDS,<br><br>                              Petitioner,<br><br>v.<br><br>AMY MILLER, Warden, et al.,<br><br>                              Respondents. | Civil No.    14-0429 JAH (KSC)<br><br>**(1) REPORT AND RECOMMENDATION RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS,**<br><br>**(2) ORDER DENYING REQUESTS FOR AN EVIDENTIARY HEARING AND DISCOVERY [ECF Nos. 3, 19]**<br><br>**(3) ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESS [ECF No. 27]** |

## I.    INTRODUCTION

Petitioner Samuel Edwards, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition"), challenging his conviction for four counts of robbery in San Diego County Superior Court case number SCN262743. (Pet. at 1, ECF No. 1 ("Pet.").)[1] The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the

---

[1]   Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

Traverse, the lodgments, the record, and all the supporting documents submitted by both parties. For the reasons discussed below, the Court **DENIES** the request for an evidentiary hearing, **DENIES** the motion for discovery, **DENIES** request for appointment of an expert witness, and **RECOMMENDS** the Petition be **DENIED**.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

*May 24 Robbery (Count 1)*

On the night of May 24, 2009, Tiffany Brown drove Edwards, Rashun Mitchell and Clayton Gaunce to a Holiday Inn Express in Oceanside. (All further date references are to the year 2009.) Edwards and Mitchell are both African-American, and Gaunce is White. While Mitchell went inside the hotel, Edwards and Gaunce put on masks, hats and sweaters. Gaunce gave Edwards a silver gun.

Jillian Gomez was the front desk clerk at the hotel that night. Around 11:30 p.m., Mitchell came to the door and Gomez let him inside. After Mitchell left, Edwards walked in, pointed a gun at Gomez and directed her to unlock the door for his accomplice. Edwards and Gaunce took Gomez's wallet from her purse and money from the cash drawer in the hotel. Before leaving, the men forced Gomez to lie face down and tied her hands behind her back with zip ties.

*May 25 Robbery (Count 2)*

Later that night, Brown drove Edwards, Mitchell and Gaunce to the Best Western in Oceanside. The three men put on masks, hats, and dark colored "hoodies" and told Brown to go inside the hotel. Brown went in the hotel to determine if there was a plexiglass barrier at the front desk and then returned to the car. Gaunce again gave Edwards the gun and the three men got out of the car.

Juan Sarmiento was the front desk clerk that night at the Best Western. Shortly before 3:00 a.m., three men came into the hotel. Two of them were wearing "hoodies" and one was wearing a mask. The man wearing the mask pointed a silver gun at Sarmiento and ordered him to get on the ground. The men tied Sarmiento's hands behind his back with zip ties and asked him where the money was kept. After taking approximately $300, the men left the hotel.

When Edwards, Gaunce and Mitchell returned to Brown's car, Edwards was holding the gun. Brown drove them away from the hotel and took Edwards and Gaunce to the Mt. Vernon Inn where they were renting a room.

*May 29 Robbery (Count 3)*

On May 29, Evan Beattie was working the front desk at the Best Western in Oceanside. At approximately 2:30 a.m., two individuals wearing ski masks came into the hotel lobby. One of the men was wearing a dark colored "hoodie" and the other had on a jacket with a hood. Beattie immediately noticed that one of the men was pointing a silver or chrome colored gun at his head. The men jumped over the counter, ordered Beattie to get on the ground and then tied his hands behind his back with zip ties. They asked where the safe was located and after Beattie told them there was no money in the safe, they asked him about the cash drawer. The men took approximately $190 from the cash drawer and left the hotel.

*May 30 Robbery (Count 4)*

On May 30, Neil Shamon was working as the night clerk at the Mt. Vernon Inn in Escondido. At around midnight, three men walked into the hotel. One of those men pointed a silver gun at Shamon and demanded to know where the money was located. After Shamon told them the money was in the register, the men walked behind the counter, forced Shamon to put his hands behind his back, and tied him up with zip ties.

A guest at the Mt. Vernon Inn, Sandy Machin, entered the lobby and noticed that the hotel was being robbed by two African-American men and either a White or Asian man. When Machin turned around and walked out, one of the African-American men chased him and told him not to say anything. The other African-American man came out of the lobby, put a silver gun to Machin's forehead, and also told him not to say anything. Machin testified that the African-American man that chased him was not Edwards.

The three men left the hotel with approximately $600. Machin went back into the hotel lobby and untied Shamon. Shamon called the police.

*Investigation*

On June 3, police officers found Edwards, Gaunce and two other people in a hotel room at the Best Value Inn in Escondido. Gaunce and Edwards said that the room was registered to them. Inside the room, officers found a silver gun behind the television. They also found a black "hoodie" with gloves and a ski mask in the pockets.

A DNA analysis performed on the gun showed that at least two people contributed to the DNA found on the trigger, with Gaunce being a major contributor. Edwards was a major contributor of DNA found on the mask and sweatshirt.

(Lodgment No. 6 at 2-4.)

/ / /

## III.   PROCEDURAL BACKGROUND

On November 10, 2009, the San Diego County District's Attorney Office filed an Amended Information charging Edwards with four counts of robbery (Cal. Penal Code § 211).  (Lodgment No. 1, Clerk's Tr. vol. 1 at 12-13.)  It was further alleged that Edwards personally used a firearm during the commission of the robberies (Cal. Penal Code § 12022.53(b)).  In addition, the information alleged Edwards had previously suffered a prison prior (Cal. Penal Code §§ 667.5(b) and 668), a serious felony prior and a strike prior (Cal. Penal Code §§ 667(a)(1), 668, 1192.7(c)), and a prior strike conviction (Cal. Penal Code §§ 667(b)-(i), 1170.12, 668).  (Lodgment No. 1, Clerk's Tr. vol. 1 at 12-15.)

On June 14, 2010, after a jury trial, Edwards was found guilty on all counts. (Lodgment No. 1, Clerk's Tr. at 180-83).  The jury also found that Petitioner had personally used a firearm in committing the robberies.  (*Id.*)  On the same day, a bench trial was held on the prior convictions and the trial judge found each allegation to be true.  (Lodgment No. 2, Rep.'s Tr., vol. 3 at 516-23.)  On November 18, 2010, the trial court denied Edwards' motion to dismiss the prior strike conviction and sentenced Edwards to 32 years in prison.[2]  (*Id.* at 535.)  On February 18, 2011, court amended the sentence to impose a consecutive five year term for the serious felony enhancement. (Lodgment No. 2, Rep.'s Tr. Supplemental at 1.)  Thus, Edwards was ultimately sentenced to 37 years in prison.

Petitioner appealed his conviction to the California Court of Appeal.  (*See* Lodgment No. 3.)  On August 16, 2012, the appellate court affirmed the conviction in a reasoned decision.  (Lodgment No. 6.)  Edwards then filed a petition for review in the

---

[2] The trial court sentenced Edwards to three years for the count one robbery, doubled to six years for the prior strike conviction.  The court imposed a consecutive sentence of 10 years for the firearm enhancement under count one.  For counts two, three and four, the trial court imposed three consecutive terms of two years for the robberies and three consecutive terms of three years and four months for the firearm enhancements under each of those counts. (Lodgment No. 1, Clerk's Tr. at 226; *see also* Lodgment No. 2, Rep.'s Tr. vol. 3 at 534.)  The trial court originally stayed the five year prior serious felony enhancement (*see* Lodgment No. 1, Clerk's Tr. vol. 1 at 226).

U:\Pro Se Law Clerks\HABEAS\KMG\R&R's\Edwards.wpd, 31715

14cv0429

1  California Supreme Court (Lodgment No. 7) which was denied on October 24, 2012.
2  (*See* Lodgment No. 8.)

3      On February 13, 2013, Edwards filed a petition for writ of habeas corpus with the
4  California Supreme Court. (Lodgment No. 9.) The court denied the petition on May 15,
5  2013. (Lodgment No. 10.)  Edwards filed a second petition for writ of habeas corpus
6  with the state supreme court on September 16, 2013. (Lodgment No. 11.) It was denied
7  on January 15, 2014. (Lodgment No. 12.)

8      On February 24, 2014, Petitioner filed the instant federal petition for writ of
9  habeas corpus (ECF No. 1) along with a motion for evidentiary hearing and request to
10 subpoena evidence. (ECF No. 3.)  Respondent filed an Answer on May 8, 2014. (ECF
11 No. 9.) Edwards filed a Traverse on July 22, 2014. (ECF No. 17.) On August 7, 2014,
12 Petitioner filed a supplement to his motion for an evidentiary hearing. (ECF No. 19.)
13 Finally, Petitioner filed a motion for appointment of expert witness on January 9, 2015.
14 (ECF No. 27.)

15 **IV.    DISCUSSION**

16      Edwards raises six claims in his Petition.  First, he claims he received ineffective
17 assistance of trial counsel, in violation of his Sixth Amendment rights. (*See* Pet. at 40-
18 44, 83-95, ECF No. 1.)  Second, he argues DNA evidence was improperly admitted at
19 trial, in violation of his due process rights. (*Id.* at 45-52, 102-14.)  In his third claim,
20 Edwards contends he received ineffective assistance of appellate counsel, in violation
21 of his Sixth Amendment rights. (*Id.* at 53-58, 115-19.)  Fourth, he argues there was
22 insufficient evidence to support his conviction on counts one and two, in violation of his
23 due process rights. (*Id.* at 59-67, 120-129.)  In his fifth claim, he asserts there was
24 insufficient evidence to support his conviction on counts three and four. (*Id.* at 68-73,
25 130-38.)  Finally, he argues he was denied his right to confront witnesses against him,
26 in violation of the Sixth Amendment. (*Id.* at 74-79, 140-44.) Petitioner also requests an
27 / / /
28 / / /

evidentiary hearing and discovery (ECF Nos. 3, 17, 19)[3] and appointment of an expert witness. (ECF No. 27.)

Respondent argues claims one, two and six are procedurally barred. (Mem. of P. & A. Supp. Answer at 8-11, ECF No. 9.) Respondent further asserts that the state court's resolution as to claims four, five and six was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (*Id.* at 11-15.)

## A.   Procedural Default

Petitioner first presented claims one, two and six to the California Supreme Court in a petition for writ of habeas corpus, filed on September 16, 2013. (*See* Lodgment No. 11.) The court denied the petition with citation to *In re Clark*, 5 Cal. 4th 464, 767-69 (1993), *People v. Duvall*, 9 Cal. 4th 464, 474, and *In re Dixon*, 41 Cal. 2d 756, 759 (1953). (Lodgment No. 12.)

"The procedural default doctrine 'bar[s] federal habeas [review] when a state court decline[s] to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement.'" *Calderon v. United States District Court*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). The doctrine "'is a specific application of the general adequate and independent state grounds doctrine.'" *Calderon*, 96 F.3d at 1129 (quoting *Wells v. Maass*, 28 F.3d 1005, 1008 (9th Cir. 1994)). Under the adequate and independent state grounds doctrine, federal courts "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Calderon*, 96 F.3d at 1129 (quoting *Coleman*, 501 U.S. at 729); *see also La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001); *Park v. California*, 202 F.3d 1146, 1151 (9th Cir. 2000).

/ / /

---

[3] On September 8, 2014, this Court denied Petitioner's requests for an evidentiary hearing and discovery without prejudice, and to be reconsidered "at the time [the Court] prepares a report and recommendation for the District Court." (ECF No. 24, Order at 7.)

The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent must first have "adequately pled the existence of an independent and adequate state procedural ground." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). Once the defense is placed at issue, the burden shifts to the petitioner, who must then "assert[ ] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." *Id.* The "ultimate burden" of proving procedural default, however, belongs to the state. *Id.* If the state meets this burden, federal review of the claim is foreclosed unless the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

When the California Supreme Court invokes several procedural rules without specifying which rule applied to which claim, each of the procedural rules cited must rest on independent and adequate state grounds. *See Washington v. Cambra*, 208 F.3d 832, 834 (9th Cir. 2000) (holding habeas claims not procedurally defaulted if either procedural bar cited by state supreme court was not independent and adequate because state court "invoked both rules without specifying which rule applied to which of [petitioner's] two claims"); *Calderon*, 96 F.3d 1126, 1131 (9th Cir. 1996) (finding no procedural default when state supreme court denial cited several procedural bars but provided no basis to discern their application to each claim).

Here, the California Supreme Court cited three cases when denying Edwards' petition. The citation to *In re Clark*, 5 Cal. 4th at 767-69, stands for the proposition that a petitioner is barred from rasing claims in a second petition that could have been, but were not raised in the first habeas petition. *In re Dixon* requires a habeas petitioner to have first pursued the claims on direct appeal, if possible. *Dixon*, 41 Cal. 2d at 759; *see also Park v. California*, 202 F.3d 1146, 1151 (9th Cir. 2000). Finally, under *Duvall*, an application for habeas corpus must "state fully and with particularity the facts on which relief is sought" and "include copies of reasonably available documentary evidence

1  supporting the claim, including pertinent portions of trial transcripts and affidavits or
2  declarations." *Duvall*, 9 Cal. 4th at 474.

3       Respondent argues that *Clark* and *Dixon* are both independent and adequate state
4  procedural bars. (*See* Mem. of P. & A. Supp. Answer at 8-11, ECF No. 9.) Respondent
5  does not, however, assert that *Duvall* constitutes an independent and adequate state bar.
6  Rather, Respondent merely states that *Duvall* stands for the proposition that Edwards'
7  claims failed to state a prima facie case for relief. (*Id.* at 8.) Accordingly, Respondent
8  has failed to meet her burden to plead the independence and adequacy of all three bars
9  cited by the California Supreme Court. *See Bennett*, 322 F.3d at 586; *see also*
10 *Hernandez v. Paramo*, 2014 WL 1203139 (S.D. Cal. Mar. 21, 2014) (finding claims not
11 procedurally defaulted when Respondent argued *Dixon* was independent and adequate
12 but failed to argue the same for *Duvall*). As such, claims one, two and six are not
13 procedurally defaulted.[4] *See Cambra*, 208 F.3d at 834.

14      This Court will therefore address the merits of the claims. *See Lambrix v.*
15 *Singletary*, 520 U.S. 518, 525 (1997) (noting that, in the interest of judicial economy,
16 courts may resolve easier matters where complicated procedural default issues exist); *see*
17 *also Flourney v. Small*, 681 F.3d 1000, 1004 n. 1 (9th Cir. 2012) ("While we ordinarily
18 resolve the issue of procedural bar prior to any consideration of the merits on habeas
19 review, we are not required to do so when a petition clearly fails on the merits.")
20 / / /

21

22      [4] Even assuming Respondent had met her initial burder with regard to *Duvall*, it is not
clear the claims would be procedurally defaulted. Although some federal courts have found that
23 *Clark* and *Dixon* constitute independent and adequate state grounds, *see e.g., Rutledge v.*
*Katavich*, 2012 WL 2054975, *7 (N.D. Cal. June 5, 2012) (finding California's prodcural rule
24 against successive petitions bars federal habeas review); *see also Ray v. Cate*, 2014 WL
3841214, *4-5 (N.D. Cal. Feb. 4, 2014); *Cantrell v. Evans*, 2010 WL 1170063, *13-14 (E.D.
25 Cal. Mar. 24, 2010 (concluding the *Dixon* bar is independent and adequate), whether *Duvall*
constitutes such grounds is less clear. *See Dodds v. Hedgpeth*, 2011 WL 6951829, *4-5 (C.D.
26 Cal. June 14, 2011) (finding state supreme court's denial citing *Clark*, *Swain*, and *Duvall*
ambiguous and insufficient to constitute a procedural bar even though *Clark* had been found to
27 be independent and adequate). Thus, Petitioner's claims may not be procedurally barred even
if Respondent had plead the independence and adequacy of all three procedural bars. *See Peyton*
28 *v. Lopez*, 2012 WL 1203484 (C.D. Cal. Feb. 12, 2012); *see also Bodar v. Davis*, 2014 WL
794575, *20 (C.D. Cal. Feb. 26, 2014).

## B.    Standard of Review

Edwards' Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997). With respect to claims three, four and five, which were adjudicated on the merits in the state court, under AEDPA, a habeas petition will not be granted unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

With respect to those claims, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).  In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.*  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "[A] federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."   *Harrington v. Richter*, 562 U.S.– , 131 S.Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

With respect to claims one, two and six, which were not adjudicated on the merits by the state court but denied on procedural grounds, the Court must conduct a de novo review. *See Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005) (applying de novo standard of review to a claim in a habeas petition that was not adjudicated on the merits by the state court); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (same).

1
**C.    Insufficient Evidence: (Claims Four and Five)[5]**

2    Edwards argues there was insufficient evidence to convict him of counts one and
3  two (claim four) and counts three and four (claim five), in violation of his due process
4  rights. Respondent counters that claim four is without merit (*see* Mem. of P. & A. Supp.
5  Answer at 11-13, ECF No. 9), and the state court's denial of claim five was neither
6  contrary to, nor an unreasonable application of, clearly established law. (*Id.* at 13-15.)

7
1.    Clearly Established Law

8    The clearly established law regarding sufficiency of the evidence claims is set
9  forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In *Jackson*, the Supreme Court
10  held that the Fourteenth Amendment's Due Process Clause is violated "if it is found that
11  upon the evidence adduced at the trial no rational trier of fact could have found proof of
12  guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *see also Juan H. v. Allen*,
13  408 F.3d 1262, 1275 (9th Cir. 2005); *see also Cavazos v. Smith*, __ U.S. __ , 132 S.Ct.
14  2, 6 (2011) (per curiam ) (a habeas court "may set aside the jury's verdict on the ground
15  of insufficient evidence only if no rational trier of fact could have agreed with the jury").
16  The Court must engage in a thorough review of the state court record and view the
17  evidence in the "light most favorable to the prosecution and all reasonable inferences
18  that may be drawn from this evidence." *Juan H.*, 408 F.3d at 1275 (citing *Jackson*, 443
19  U.S. at 319).    A petitioner's insufficient evidence claim must be examined "with
20  reference to the elements of the criminal offense as set forth by state law." *Juan H.*, 408
21  F.3d at 1275.

22    A habeas court reviewing a sufficiency of the evidence claim must consider all
23  evidence admitted at trial, "regardless whether that evidence was admitted erroneously."
24  *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (per curiam) (citation omitted).
25  Furthermore, "[c]ircumstantial evidence and inferences drawn from that evidence may
26  be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.

27

28
[5] Because the resolution of claims four and five necessarily includes discussion relevant to Petitioner's other claims, the Court will address these claims first to avoid repetition.

1  1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.) *amended on denial*

2  *of reh'g*, 798 F.2d 1250 (9th Cir. 1986).   A federal habeas court faced with a record

3  supporting conflicting inferences "must presume – even if it does not affirmatively

4  appear in the record – that the trier of fact resolved any such conflicts in favor of the

5  prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326; *see also*

6  *McDaniel*, 558 U.S. at 131.  A petitioner faces a "heavy burden" when seeking habeas

7  relief by challenging the sufficiency of evidence used to obtain a state conviction on

8  federal due process grounds. *Juan H.*, 408 F.3d at 1275.

9                    2.    Claim Four: Counts One and Two

10          Edwards argues his due process rights were violated because there was insufficient

11  evidence to support his convictions on counts one and two.  (Pet. at 59-67, 120-29, ECF

12  No. 1, *see also* Traverse at 32-33, ECF No. 17.)  He raised this claim in a petition for

13  writ of habeas corpus in the California Supreme Court (*see* Lodgment No. 9), which was

14  denied without comment or citation. (Lodgment No. 10.)  Because there is no reasoned

15  state court decision, this Court must conduct an independent review of the record to see

16  if the state supreme court's decision was objectively unreasonable in light of Supreme

17  Court law. *Himes*, 336 F.3d at 853.

18                    a.    Count One: Holiday Inn Express

19          In count one, Petitioner was convicted of the May 24, 2009 robbery of the Holiday

20  Inn Express in Oceanside.  (*See* Lodgment No. 1, Clerk's Tr. vol. 1 at 180-81.)

21  "Robbery is the felonious taking of personal property in the possession of another, from

22  his person or immediate presence, and against his will, accomplished by means of force

23  or fear." Cal. Penal Code § 211.  The jury also found that Edwards personally used a

24  firearm during the commission of the robbery. (*See* Lodgment No. 1, Clerk's Tr. vol. 1

25  at 180-181.)  Under California Penal Code section 12022.53, "any person any person

26  who, in the commission of a [robbery], personally uses a firearm, shall be punished by

27  an additional and consecutive term of imprisonment in the state prison for 10 years. The

28  firearm need not be operable or loaded for this enhancement to apply." Cal. Penal Code

§ 12022.53(a)(4), (b).  A jury may find a gun use allegation true when it concludes a defendant "utilized the gun at least as an aid in completing an essential element of" a subsequent crime. *People v. Masbruch*, 13 Cal. 4th 1001, 1012 (1996) (citing *People v. Chambers*, 7 Cal.3d 666, 672-73 (1972)).

At trial, Jillian Gomez, the Holiday Inn Express night auditor, testified that at approximately 11:30 p.m. on May 24, 2009, Rashun Mitchell, who she had dated previously, entered the lobby of the hotel and asked if there were rooms available. (Lodgment No. 2, Rep.'s Tr. vol. 2 at 124-25.)  Mitchell was wearing a black hat with a "P" on it. (*Id.* at 132.)  Gomez told him the hotel was booked and Mitchell left. (*Id.* at 126, 130-131.)  A few minutes later, Edwards appeared at the hotel door and Gomez buzzed him in.  He was wearing a dark hooded sweatshirt, or "hoodie." (*Id.* at 139; *see also* Lodgment No. 1, Clerk's Tr. vol. 1 at 083.)  She then saw that Edwards was armed with a silver handgun. (Lodgment No. 2, Rep.'s Tr. vol. 2 at 139, 144.)

Edwards ordered Gomez against the wall, and he jumped over the desk.  He put the gun to her head and forced her to press the button to open the lobby door so that his accomplice could enter. (*Id.* at 140, 158.)  Gomez complied and a second man entered the lobby. (*Id.* at 140-141.)  Gomez identified the second man as Gaunce, who wore a dark hoodie and a red brimmed hat with an emblem on it.[6] (*Id.* at 140, 159.)  Edwards and Gaunce took money from the cash drawer in the hotel.  They then forced Gomez to lie face down on the floor and tied her hands behind her back with black zip-ties. (*Id.* at 143, 166.)  As Edwards and Gaunce were leaving, Gaunce took Gomez's wallet from her purse. (*Id.* at 143.)  Gomez positively identified Edwards as the assailant who held the gun. (*Id.* at 137-38, 165.)  She also testified that the gun used during the robbery looked like the gun that was later recovered at the Best Value Inn, where Gaunce and Edwards were apprehended. (*Id.* at 164-65, 188.)

---

[6] Gomez saw Gaunce, who she knew through Mitchell, a few days after the robbery.  He was wearing the same hoodie and red hat. (*Id.* at 146-47.)  At that time, she recognized Gaunce as the second, masked, unarmed perpetrator by his voice. (*Id.* at 148.)

1    In addition to Gomez's testimony regarding count one, Tiffany Brown testified
2    that on May 24, 2009, she drove Mitchell, Gaunce and Edwards to the Holiday Inn
3    Express. (*Id.*, vol. 3 at 317-321.)  Mitchell got out of the car and was gone for a few
4    minutes.  During that time, Edwards and Gaunce put on masks, hats and dark colored
5    hooded sweatshirts. (*Id.* at 322, 328.)  After Mitchell returned to the car, Gaunce gave
6    Edwards a silver gun. (*Id.* at 323.)  The two got out of the car and walked toward the
7    hotel. (*Id.* at 334-35.)   They returned after a couple minutes.  When they got into the
8    car, Brown saw Edwards hand the gun back to Gaunce. (*Id.* at 324.)  The gun Edwards
9    held that night looked like the gun that was ultimately recovered at the Best Value Inn.
10   (*Id.* at 334.)

11    The robbery of Holiday Inn Express was also captured on a security video, which
12   was shown to the jury. (*Id.*, vol. 2 at 134.)   The footage showed a man enter the hotel
13   wearing a dark hoodie and pointing a silver gun a Gomez.  A second man then entered,
14   wearing a hooded jacket, mask and baseball cap with a red brim. (*See id.* at 139-40, 146-
15   47, 158.)

16    Gaunce and Edwards were eventually found by police on June 3, 2009 at a hotel
17   room at the Best Value Inn, in Escondido.  Inside the room, police found a loaded, silver
18   colored, semi-automatic handgun. (*Id.*, vol. 3 at 294-96, 298-99, 302.)  They also found
19   a black hooded sweatshirt, with gloves and a black knit mask in the pockets. (*Id.* at 303,
20   305.)  DNA analysis was performed on the gun, sweatshirt, gloves and mask.  Edwards
21   was a major contributor of the DNA found on the hoodie and mask. (*Id.* at 396-400.)

22    When viewed in the light most favorable to the verdict, there was more than
23   sufficient evidence to convict Edwards on count one.  Gomez stated Edwards pointed a
24   gun at her, tied her hands with zip ties, and took money from the cash drawer.  The eye
25   witness testimony of Gomez alone was sufficient for a reasonable juror to find Edwards
26   guilty of robbery and personal use of a firearm.  It is well-settled that the testimony of
27   a single witness is sufficient to support a conviction under the *Jackson* standard.  *United*
28   *States v. McClendon*, 782 F.2d 785, 790 (9th Cir. 1986); *see also United States v. Larios*,

640 F.2d 938, 940 (9th Cir. 1981) (testimony of one eyewitness sufficient to uphold conviction).

Additionally, Brown's testimony corroborated Gomez's account. She placed Edwards at the scene of the Holiday Inn Express on the night of the robbery and testified that Edwards had possession of the silver gun when he left her car, and when he returned from the hotel. The jury also saw the surveillance video of the robbery. A silver gun matching the weapon described by Gomez was recovered in the hotel room where Edwards was ultimately found, along with a hoodie and mask containing his DNA. In light of the considerable evidence presented at trial, a rational jury could have found Edwards guilty of robbery and personal use of a firearm as to count one. *See Jackson*, 443 U.S. at 324; *see also Juan H.*, 408 F.3d at 1275. The state court's denial of the claims was not objectively unreasonable. *Himes*, 336 F.3d at 853.

### b.    Count Two: Best Western Oceanside

In count two, Edwards was convicted of the May 25, 2009 robbery of the Oceanside Best Western, and personal use of a firearm. Brown testified that some hours after the Holiday Inn Express robbery, she drove Edwards, Gaunce and Mitchell to the Best Western in Oceanside. (Lodgment No. 2, Clerk's Tr. vol. 3 at 325-27.) Gaunce directed Brown to go into the hotel to determine if there was any sort of barrier at the front desk. (*Id.* at 328-29.) The men put on hats and hoods while they waited in the car. When Brown returned, she saw Gaunce give the silver colored gun to Edwards, and the three men walked toward the hotel. (*Id.* at 329-30.) When Gaunce, Edwards and Mitchell returned, Edwards was carrying the gun. (*Id.* at 331.)[7] Brown drove the men away from the hotel and dropped Mitchell off in Oceanside, and took Edwards and Gaunce to the Mount Vernon Inn in Escondido. (*Id.* at 326, 330-31.)

The desk clerk of the Oceanside Best Western, Juan Sarmiento, testified that just before 3:00 a.m. on May 25, 2009, he was in a back office to warm up some food. He

---

[7] Occasionally during the trial, Brown refers to Edwards by his nickname, "Double D." (*See* Lodgment No. 2, Rep.'s Tr. vol. 2 at 319, 331.)

turned around to find three men in the office. (*Id.* vol. 2 at 206-08.) Two of the men wore hoodies and jeans, one of them also wore a mask. (*Id.* at 209-10.) The man in the hoodie with the mask pointed what appeared to be a silver colored gun at Sarmiento, ordered him to get on the ground and not look up. (*Id.* at 208-10, 218, 229.) The men tied Sarmiento's hands behind his back with zip-ties and asked where the money was kept. (*Id.* at 211.) Sarmiento directed them to the register. The men took $300 and left. (*Id.* at 207.) Sarmiento did not get a good look at the faces of the three men, but believed the man who pointed the gun at him was black. (*Id.* at 209, 221.) Gaunce is white and Edwards and Mitchell are black. (*Id.* at 161-62.) The robbery was captured on security video and was played for the jury. (*Id.* at 214.)

There is sufficient evidence to support Edwards' conviction for robbery and personal use of a firearm on count two. Based on Brown's testimony, in conjunction with the video footage and Sarmiento's testimony, when viewed in the light most favorable to the prosecution, a reasonable juror could conclude that Mitchell, Gaunce and Edwards robbed the hotel. In addition, a jury could reasonably infer that Edwards was the man who pointed the gun at Sarmiento based on Brown's testimony that Edwards had the gun just before entering the hotel, and just after exiting, along with the discovery of a silver gun in the hotel room where Edwards was ultimately found, along with a hoodie and mask containing his DNA. *See Juan H.*, 408 F.3d at 1275. Accordingly, the state court's denial of this claim was not objectively unreasonable. *See Himes*, 336 F.3d at 853.

c.   DNA Evidence

Edwards argues there was insufficient evidence to support his convictions on counts one and two because the DNA evidence was unreliable. (*See* Pet. 62-65, ECF No. 1.) He claims that the hoodie and mask found to contain his DNA were mishandled, causing cross-contamination. (*Id.*) Cathy Chang, a criminalist with the San Diego Sheriff's Crime Lab, testified that Edwards was a major contributor to DNA found on the ski mask and hooded jacket, both recovered from the hotel room where police

1    apprehended Gaunce and Edwards. (Lodgment No. 2, Rep.'s Tr. vol. 3 at 396-97, 399.)

2    On cross-examination, defense counsel noted that the mask, gloves and hooded jacket

3    had been packaged together and asked Chang if cross-contamination could have

4    occurred. (*Id.* at 407-08.)   She testified that transfer was possible under certain

5    conditions, for instance, if there was wet body fluid on an item which then came in

6    contact with another item. (*Id.* at 409-10.)

7         Viewing the evidence in the light most favorable to the verdict, as this Court must,

8    the jury credited Chang's ultimate conclusion that Edwards' DNA was found on the

9    hooded jacket and the mask. *See Juan H.*, 408 F.3d at 1275; *Jackson*, 443 U.S. at 326;

10   *see also Maass*, 45 F.3d at 1358 (reviewing court must respect the exclusive province

11   of the factfinder to determine the credibility of witnesses, resolve evidentiary conflicts,

12   and draw reasonable inferences from proven facts by assuming that the jury resolved all

13   conflicts in a manner that supports the verdict). Furthermore, as discussed above, there

14   was substantial evidence to support the convictions on counts one and two, beyond the

15   DNA evidence – most significantly, the testimony of Gomez and Brown.

16                    d.    Gomez's Identification

17        Petitioner argues there was insufficient evidence to convict him of count one

18   because Gomez's identification was so impermissibly suggestive as to render his trial

19   fundamentally unfair. (Pet. at 125-28, ECF No. 1.) As discussed above, a habeas court

20   reviewing a sufficiency of the evidence claim must consider all evidence admitted at

21   trial, "regardless whether that evidence was admitted erroneously." *McDaniel*, 558 U.S.

22   at 131. Thus, Edwards' insufficiency of evidence claim fails even if Gomez's testimony

23   was admitted in error.

24        Further, to the extent Edwards attempts to present this argument as an independent

25   due process subclaim, it is without merit.  Gomez identified Edwards for the first time

26   at the preliminary hearing. (*See* Lodgment No. 2, Rep.'s Tr. vol. 2 at 161-62.) Although

27   the Supreme Court has held that certain pre-trial identification procedures may run afoul

28   of the federal Constitution, *see Neil v. Biggers*, 409 U.S. 188, 198-200 (1972) (holding

1  pre-trial identification procedures violate due process only when unduly suggestive

2  under the "totality of the circumstances"), it has never applied this analysis to in-court

3  identifications like the one here. *See United States v. Domina*, 784 F.2d 1361, 1368 (9th

4  Cir. 1986) (noting Supreme Court has not "set any guidelines for in-court identification

5  procedures nor indicated that in-court identification must be made in a way that is not

6  suggestive").

7        The Ninth Circuit has pointed out the inherent suggestiveness of in-court

8  identification procedures where a witness points out the defendant who is seated at the

9  table with counsel. *United States v. Burdeau*, 168 F.3d 352, 358 (9th Cir. 1999); *United*

10  *States v. Williams*, 436 F.2d 1166, 1168 (9th Cir.1970). Although the court has advised

11  using procedures which minimize the prejudicial effect of in-court identifications, it has

12  concluded that "[t]here is no constitutional entitlement to an in-court line-up or other

13  particular method of lessening the suggestiveness of an in-court identification . . . ."

14  *United States v. Domina*, 784 F.2d 1361, 1369 (9th Cir. 1986). The Ninth Circuit has

15  "held that the suggestive character of courtroom logistics [is] not unnecessarily

16  suggestive." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (emphasis in original).

17        The circumstances of Gomez's courtroom identification are strikingly similar to

18  those discussed by the Ninth Circuit in *Baker v. Hocker*, 496 F.2d 615 (9th Cir. 1974).

19  There, the court held that a robbery victim's identification of the defendant at a

20  preliminary hearing was not unnecessarily or impermissibly suggestive, even though the

21  petitioner was seated next to the two co-defendants whom the victim had previously

22  identified, thereby suggesting that petitioner was the third robber. While the Ninth

23  Circuit noted that courtroom procedures could be suggestive, it stressed that only

24  "unnecessary" or "impermissible" suggestion violates due process. *Id.* at 617. After

25  balancing the state's strong interest in conducting the court procedure against the

26  dangers of misidentification, which were already mitigated by cross-examination, the

27  court held that the suggestive character of courtroom logistics was not unnecessarily

28  suggestive. *Id.; see also Johnson v. Sublett*, 63 F.3d 926 (9th Cir. 1995).

1    Here, like in *Baker*, the first time Gomez was asked to identify Petitioner was at

2 the preliminary hearing, where his co-defendants, Gaunce and Mitchell, were also

3 present. (Lodgment No. 2, Rep.'s Tr. vol. 2 at 162; *see also* Pet. at 270, Ex. M p. 11,

4 ECF No. 1.)  At the time of the hearing, Gomez had already identified Mitchell and

5 Gaunce from photographs. (*See* Lodgment No. 2, Rep.'s Tr. vol. 2 at 161.)  Although

6 the circumstances may have been somewhat suggestive, it does not rise to the level of

7 a due process violation. *See Baker*, 496 F.2d at 617.

8    Moreover, the evidence also suggests that the Gomez's identification was

9 sufficiently reliable to outweigh any inference that the in-court identification procedure

10 was impermissibly suggestive.  At the preliminary hearing, she testified that she saw the

11 gunman's face when he entered the lobby. (*See* Pet. at 269-70, 282-83, 287, Ex. M, ECF

12 No. 1.)  She was subject to vigorous cross-examination by defense counsel about her

13 identification, and she consistently stated that she saw Edwards' face. (*See* Pet. at 282-

14 87, Ex. M. ECF No. 1.)  At trial, she reaffirmed numerous times on both direct and cross-

15 examination that she had seen Petitioner's face when he entered the lobby and

16 approached her. (*See* Lodgment No. 2, Rep.'s Tr. vol. 2 at 137, 139, 153, 155, 157, 165.)

17 Gomez testified that her identification was a product of her memory and not the result

18 of any suggestiveness in the courtroom procedures. (*See id.* at 163.)  In addition, during

19 an interview with Detective Darrah conducted a few days after the robbery, Gomez stated

20 that she saw the gunman's face and she would be able to recognize him if she saw him

21 again. (Lodgment No. 1, Clerk's Tr. vol. 1 at 093, *see also* Lodgment No. 2, Rep.'s Tr.

22 vol. 2 at 171.)  Thus, there was no due process violation in admitting the identification

23 because the record supports a finding that it was based on her independent recollection.

24 *See United States v. Burdeau*, 168 F.3d 352, 358 (9th Cir. 1999) (holding in-court

25 identification is not unnecessarily suggestive where the witness has an independent

26 recollection of the defendant).   Accordingly, Gomez's identification was not

27 unnecessarily suggestive and therefore did not render Edwards' trial fundamentally

28 unfair.

e.    Brown's Testimony

Edwards next argues there is insufficient evidence to support his conviction on counts one and two because Tiffany Brown's testimony should have been excluded as uncorroborated accomplice testimony under California Penal Code section 1111.[8] (*See* Pet. at 61, 127, ECF No. 1.)  Again, even assuming Brown's testimony was erroneously admitted, it does not impact the Court's above conclusion that sufficient evidence supports his convictions on both counts. *See McDaniel*, 558 U.S. at 131.

To the extent Petitioner is again attempting to raise an independent sub-claim, he is not entitled to relief.   First, contrary to Edwards' assertion, Brown's testimony was corroborated by Gomez's testimony, Sarmiento's testimony, the video surveillance footage, and the physical evidence recovered at the hotel where police found Gaunce and Edwards, which included the hoodie and mask containing Edwards' DNA, and the gun. *See People v. Rodrigues*, 8 Cal. 4th 1060, 1128 (2011) (stating corroborating evidence may be circumstantial and so slight as to be "entitled to little consideration when standing alone" and is "sufficient if it substantiates enough of the accomplice's testimony to establish his credibility") (internal quotations and citations omitted).

Furthermore, while California law requires accomplice testimony be corroborated, California's statutory rules regarding accomplice testimony are not constitutionally mandated. *See United States v. Augenblick*, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."); *Laboa v. Calderson*, 224 F.3d 972, 979

---

[8] California Penal Code section 1111 states:

> A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

> An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

(9th Cir. 2000) ("[a]s a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or substantial on its face,' [Section 1111] is not required by the Constitution or federal law"); *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir. 1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face.") Accordingly, Edwards' claim that Brown's testimony was admitted in violation of his due process rights is without merit.

### f.    Conclusion

Based on the foregoing, the state court's denial of Edwards' sufficiency of evidence claims as to counts one and two, was not objectively unreasonable. *See Himes*, 336 F.3d at 853. In addition, to the extent Petitioner alleges his due process rights were violated by the admission of Gomez's identification and Brown's accomplice testimony, his claims are without merit. The Court recommends claim four be **DENIED.**

### 3.    Claim Five:  Counts Three and Four

In claim five, Edwards argues there was insufficient evidence to support his convictions for the May 29, 2009 robbery of the Oceanside Best Western (count three) and the May 30, 2009 robbery of the Mount Vernon Inn (count four). He also argues evidence was insufficient to prove he personally used a firearm. (*See* Pet at 68-73, 130-39, ECF No. 1; *see also* Traverse at 34-35, ECF No. 17.) Edwards raised this claim in his petition for review to the California Supreme Court. (Lodgment No. 7.) That court denied the petition without citation of authority. (Lodgment No. 8.) Accordingly, this Court must "look through" to the state appellate court's opinion as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

*A. Standard of Review*

> In determining the sufficiency of the evidence to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 (*Jackson*).) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is,

evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ""presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."" [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal. 4th 856, 943.) The same principles apply to our determination of the sufficiency of the evidence to support a true finding on a firearm enhancement. (*See People v. Alvarez* (1996) 14 Cal.4th 155, 225.)

### B. Sufficient Evidence Supported the Jury's Verdicts on Counts 3 and 4

There was considerable evidence from which the jurors could have reasonably found that Edwards participated in the robberies charged in counts 3 and 4 at the Best Western and Mt. Vernon Inn. Officers found a black "hoodie" and a ski mask in Edwards's hotel room. Edwards's DNA was on both of those items. Officers also found a silver gun hidden behind the television.

Surveillance videos of the four robberies showed two men in dark hooded sweatshirts or jackets participating in the robberies. Those men appear to be the same individuals in each instance. One of the men in the videos relating to counts 3 and 4 is brandishing a firearm. Although it is difficult to ascertain the color of the firearm in the video pertaining to count 3, it appears to be silver. The silver color of the gun is clear in the video pertaining to count 4.

The testimony of the victims is consistent with the videos. Beattie testified that two individuals wearing dark hooded sweatshirts or jackets robbed the Best Western while he was working on May 29. According to Beattie, one of the men pointed a silver or chrome colored gun at his head. Machin, a witness to the Mt. Vernon Inn robbery on May 30, testified that he saw two African–American men and either a White or Asian individual robbing the hotel. Two of the men were wearing dark "hoodies." Machin and Shamon, the night clerk at the Mt. Vernon Inn, both recalled that the gun used in the robbery was silver.

Additionally, all four hotel robberies were committed in a similar fashion over a short period of time. The perpetrators wore dark hooded clothing, displayed a silver gun, and tied their victims' hands behind their backs with zip ties. These characteristics are distinctive and support a strong inference that the same individuals were involved in the crimes.

Based on the totality of the evidence and all reasonable inferences drawn from that evidence, the jury could reasonably find that Edwards was involved in a robbery spree that spanned over a week. Thus, there was sufficient evidence to support the jury's guilty verdicts on counts 3 and 4.

### C. True Findings on Firearm Enhancements on Counts 3 and 4

"A firearm use enhancement attaches to an offense . . . if the firearm use aids the defendant in completing one of its essential elements." (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1012.) Moreover, "a gun may be used

"'in the commission of'" a given crime even if the use is directed toward someone other than the victim of that crime." (*People v. Granado* (1996) 49 Cal.App.4th 317, 329-330.)  Thus, "a defendant uses a gun 'in the commission' of a crime when he or she employs the gun to neutralize the victim's companions, bystanders, or other persons who might otherwise interfere with the successful completion of the crime." (*Id.* at p. 330.)

With respect to the true finding on the firearm enhancement on count 3, the Best Western robbery on May 29, we conclude there was sufficient evidence to prove Edwards "personally used" a firearm.  The surveillance videos of counts 1 and 2 show at least two men entered the hotel lobbies; the first one was holding a gun and another was wearing a red hat.  As Edwards points out, the person wearing the red hat must have been Gaunce because the evidence showed that Edwards had the gun and was the first person to enter the hotels.  Similarly, the surveillance video of count 3 shows that the first robber entered the hotel with a gun and was followed by a man in a red hat.  Based on the similarity of the crimes and the way they were committed, the jury could reasonably infer that Edwards was the individual with the firearm, as opposed to the one in the red hat.

With respect to the true finding on the firearm enhancement on count 4, the Mt. Vernon Inn robbery on May 30, we conclude the evidence was sufficient to prove Edwards "personally used" a firearm.  The evidence showed that three perpetrators committed the robbery at the Mt. Vernon Inn, two African–Americans and one Asian or White individual.  It was undisputed that Edwards and Mitchell are both African–American, and Gaunce is White.  Machin testified that when he saw the robbery taking place, he left the hotel lobby and an African–American man chased him.  According to Machin, that man was not Edwards.  The other African–American man then came out of the lobby and put a gun up to Machin's forehead.  Based on this evidence, the jury could reasonably infer that Edwards was the individual using the firearm.

In sum, there was sufficient evidence to support the firearm enhancements on counts 3 and 4.

(Lodgment No. 6 at 5-8.)

The state court's conclusion that sufficient evidence supported Edwards' convictions on counts three and four was neither contrary to, nor an unreasonable application of, clearly established law.  As to count three, Evan Beattie, the clerk at the Oceanside Best Western on May 29, 2009, testified that he was at the front desk when two men came into the lobby.  One man pointed a chrome or silver gun at Beattie's head. (Lodgment No. 2, Rep.'s Tr. vol. 2 at 233.)  The men jumped over the counter and told Beattie to get on the ground.  The unarmed man and tied Beattie's hands behind his back with zip ties.  (*Id.* at 234.)  The men demanded money and Beattie told them where the cash box was located.  (*Id.* at 236.)  The men took approximately $193.  (*Id.*)  Both men

1  wore dark hooded sweatshirts or jackets and ski masks. (*Id.* at 242-43; *see also*
2  Lodgment No. 1, Clerk's Tr. vol. 1 at 123-25.) The suspect who was not armed wore a
3  red brimmed baseball cap underneath his hood. (Lodgment No. 2, Rep.'s Tr. vol. 2 at
4  239-40.) The gun used in the robbery appeared similar to the gun later recovered from
5  the Best Value Inn, where Edwards and Gaunce were found. (*Id.* at 241.) Video
6  surveillance footage was shown to the jury and was consistent with Beattie's testimony.
7  (*See id.* at 237, 239-40)

8      With regard to count four, Neil Shamon, the night manager of the Mount Vernon
9  Inn, testified that he was sitting at behind the front desk on May 30, 2009, when three
10  men walked in. (Lodgment No. 2, Rep.'s Tr. vol. 2 at 250.) The first man to enter had
11  a silver gun. (*Id.* at 249-50, 254.) He pointed it at Shamon and demanded money. (*Id.*)
12  The gunman and another second man came behind the counter, made Shamon lie on the
13  floor and tied his hands behind his back with zip ties. (*Id.*) Shamon told the perpetrators
14  the money was in the register. The men took approximately $600. (*Id.* at 249.) Shamon
15  stated that one of the unarmed assailants wore a ball cap with a red bill. (*Id.* at 254-55.)
16  The third man, who Shamon referred to as the "look out," was African American and
17  wore a red shirt. (*Id.* at 256, 262.) Hotel records indicated that Edwards stayed at the
18  Mount Vernon Inn from May 24 to May 29, 2009, in room 129. (*Id.* at 260.) During a
19  subsequent search of room 129 conducted by Escondido Police Officer Juan Alva, a
20  transit card with Edwards' name was discovered under the bed. (Lodgment No. 2, Rep.'s
21  Tr. vol. 3 at 284-85.)

22      Sandy Machin, a guest at the Mount Vernon Inn, testified that he entered the lobby
23  to get ice and saw two black men and a white or Asian man. (*Id.* at 273.) Two of the
24  men were wearing dark hoodies and masks were tying up Shamon. (*Id.* at 273-74.)
25  Machin surmised the hotel was being robbed and walked out. The third man chased him
26  and tried to convince Machin to go back inside the office. Machin refused. (*Id.*) The
27  third man was black, wearing a red shirt, dark pants and a black hat. He did not wear a
28  mask. (*Id.* at 272.) Shortly thereafter the other two perpetrators walked out of the lobby.

Both men wore masks but Machin could see skin through the mask and concluded that the gunman was black and the other perpetrator was Asian or white. (*Id.*) The white or Asian man told Machin not to say anything. The black man put a silver gun to Machin's head and said, "Don't say anything." (*Id.* at 274.) Machin testified that the silver gun later recovered at the Best Value Inn was similar to the gun that was pointed at him the night of the robbery. (*Id.* at 278.) He also testified that the unmasked black perpetrator who chased him was not Edwards. (*See id.* at 279, 281.) The jury saw a video of the robbery, which was consistent with the testimony of Shamon and Machin. (*See id.* vol. 2 at 253.)

Although there was no eye witness to identify Edwards as a perpetrator or the gunman in the count three and count four robberies, a reasonable jury could have inferred as much from the all of the evidence presented at trial. As noted above, circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters*, 45 F.3d at 1358. The fact that the inferences are drawn primarily from circumstantial evidence does not make them erroneous or unreasonable. *United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976) (circumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from direct evidence).

As the appellate court noted, the robberies in counts three and four are strikingly similar to the first two. The perpetrators enter the lobby, wearing hooded jackets and masks, one holds a silver handgun and the other wears a ball cap with a red brim. The victims are forced to lie down and their hands are tied behind their backs. The jury was able to watch videos of all four robberies and could reasonably infer that they were committed by the same perpetrators. As discussed above, there was an abundance of evidence to support Edwards' convictions on counts one and two, including Jillian Gomez's eyewitness testimony and Tiffany Brown's accomplice testimony. Given the evidence that Gaunce wore a ball cap with a rid brim, the jurors could have reasonably inferred by the process of elimination that Edwards was the gunman. In addition,

1 Edwards and Gaunce were found in a hotel room where a loaded silver gun was
2 recovered, along with a dark hoodie and mask containing Edwards' DNA.

3    When viewed in the light most favorable to the prosecution, this evidence,
4 although circumstantial, was sufficient for a rational jury to conclude Edwards
5 committed the robberies. *See Juan H.*, 408 F.3d at 1275. Coupled with evidence of the
6 other robberies committed in the same manner and in which Edwards was identified, a
7 rational jury could infer Edwards was guilty of robbery and personal use of a firearm as
8 to counts three and four. *See Walters*, 45 F.3d at 1358. The state court's denial of the
9 claim was neither contrary to, nor an unreasonable application of, clearly established
10 law. *Williams*, 529 U.S. at 412-13. The Court recommends claim five be **DENIED**.

11    **D.    Claim One: Ineffective Assistance of Trial Counsel**

12    Petitioner claims his trial counsel was ineffective for several reasons, which fall
13 into two general categories. (*See* Pet. at 40-44, 87-98, ECF No. 1.) Edwards first argues
14 counsel was ineffective in challenging the DNA evidence presented by the prosecution.
15 (*See id.* at 41-43.) Second, he argues defense counsel failed to present key evidence to
16 refute testimony which suggested he was registered to the hotel room where the gun and
17 other evidence were found. (*See id.* at 44.)

18    Petitioner presented his ineffective assistance of counsel claim to the California
19 Supreme Court and it was denied on procedural grounds. Therefore, this Court reviews
20 the claim de novo rather than under AEDPA's deferential standard. *See Chaker*, 428
21 F.3d at 1221 (applying de novo standard of review to a claim in a habeas petition that
22 was not adjudicated on the merits by the state court); *Lewis*, 391 F.3d at 996.

23    1.    Applicable Federal Law

24    To establish ineffective assistance of counsel, a petitioner must first show his
25 attorney's representation fell below an objective standard of reasonableness. *Strickland*
26 *v. Washington*, 466 U.S. 668, 688 (1984). "This requires showing that counsel made
27 errors so serious that counsel was not functioning as the 'counsel' guaranteed the
28 defendant by the Sixth Amendment." *Id.* at 687. He must also show he was prejudiced

by counsel's errors. *Id.* at 694. Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687.

### 2. DNA Evidence

Edwards contends he received ineffective assistance of counsel related to the DNA evidence presented by the prosecution. He argues defense counsel should requested funds to hire an expert witness to evaluate and test the DNA evidence, in order to come to an independent conclusion. (*See* Pet. at 41, 88, ECF No. 1.) Further, he contends an expert should have been called to rebut the prosecution's expert witness and to "conclude that the evidence was, in fact, cross-contaminated." (*Id.*) He claims his defense attorney knew the DNA evidence had been cross-contaminated and therefore his failure to hire an expert to show it was "highly unreliable," amounted to ineffective assistance of counsel. (*Id.* at 89.)

At trial, the prosecution called forensic analyst Cathy Chang to testify. Chang had tested several items found in the hotel room where Edwards and Gaunce were located by police, including the silver colored, semi-automatic handgun, a black hooded sweatshirt, black knit gloves and a black knit ski mask. (Lodgment No. 2, Rep.'s Tr. vol.

3 at 302-303, 305-06.)  Officers initially found the gloves and ski mask inside the pockets of the black hoodie. (*Id.* at 303.) Chang tested the items and found that at least two people had contributed to a mixture of DNA found on the trigger of the gun, with Gaunce being the major contributor. (*Id.* at 392.)  She also found that at least four people contributed to a mixture of DNA found on black ski mask, with Edwards being the major contributor. (*Id.* at 395-98.) Chang also determined that at least five people contributed to a mixture of DNA found on the black sweatshirt, and that Edwards was the major contributor of that DNA. (*Id.* at 398-400.) Chang discovered mixtures of DNA on both gloves, one containing at least five individuals and the other at least three, but she was unable to draw a conclusion as to the major contributor of DNA found on either. (*Id.* at 401.)

During cross-examination, defense counsel questioned Chang about the possibility of cross-contamination. (*Id.* at 407-08.) Chang acknowledged that the jacket, gloves and ski mask were packaged together when they were gathered as evidence, and that under certain specific circumstances, cross-contamination was possible. (*Id.* at 407.) The following exchange then took place:

CHANG: So if an item is – so if an item is in contact with another item, you can argue that, you know, say DNA from one item can transfer to another item, and that's why something – somebody would possibly package items separately.

COUNSEL: So that's why you in the lab would rather not have items packaged together, because DNA from one item can go to another item; is that correct?

CHANG: It can.

COUNSEL: And that's what cross-contamination is?

CHANG: Yes, that's what I would describe as cross-contamination.

COUNSEL: Okay.  And again, that's – your report refreshes your recollection that these things were packaged together instead of separately.

CHANG: Correct.

COUNSEL: Okay. Suppose in this case you have a jacket there and you have two gloves and a ski mask.  Suppose I was to tell you

1    that when the jacket was found the ski mask and the gloves
     were in the pockets.

2    Can that cause cross-contamination?

3

CHANG:    When the jacket was found, the gloves and the ski mask were
4              in the pocket?

5    COUNSEL: Yes.

6    CHANG:    Could that cause cross-contamination? Obviously there's a lot
              of facts that go into that, but yes.
7

COUNSEL: How?
8

CHANG:    Well, just from contact.
9

COUNSEL: You mean contact from somebody let's say that has their
10             hands in the pockets?

11   CHANG:    Yea.  Again, there's a lot of factors.

12   COUNSEL: I'm not trying to put words in your mouth.

13   CHANG:    No.  That's fine.  Go ahead and ask.

14   COUNSEL: What are some factors that you as an expert think could be a
              problem?
15

CHANG:    Well, okay.  For instance, if I have a sweatshirt that I normally
16             wear and then I take – well, I take a couple of items of
              clothing and I put them in a gym bag together and they're
17             rustling around together, I wouldn't necessarily expect there
              to be transfer unless, for instance, there was some type of –
18             let's say one item was – had a wet body fluid on it, saliva or
              blood.  Obviously because that fluid is there and it's wet, it
19             transfers more easily.

20   COUNSEL: Can skin cells transfer?

21   CHANG:    Yes.

22   COUNSEL: So in other words, if somebody put a hand in the pocket, it's
              possible they could transfer.
23

CHANG:    If somebody put a hand in a pocket with an item in it?
24

COUNSEL: Yes.
25

CHANG:    Well, yes, it's possible to get what I would call touch DNA on
26             clothing. But I wouldn't necessarily  – touch –

27   ///

28   ///

1    So if you have, again, a body fluid, those – perfect world,
     those are great for DNA profiles.  We get really good DNA
2    provide from body fluids.  Once you start talking about touch
     DNA from skin cells, it gets a little more iffy.  It's just not as
3    good of a source of DNA, but that's why, when I gave the
     example about transfer, if we're talking about body fluid on an
4    item of clothing transferring, sure.  If you just have two items
     of clothing that are coming in contact, it gets a little more
5    tenuous.  A hand in the pocket is possible. Is the hand sweaty?

6    COUNSEL: That's what I was going to ask. Sweat on the hand can be
             transferred correct?
7
     CHANG:   Correct.
8

9    (*Id.* at 407-10.)

10        "Counsel has a duty to make reasonable investigations or to make a reasonable

11   decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 520.

12   As the Supreme Court has explained, "strategic choices made after thorough

13   investigation of law and facts relevant to plausible options are virtually

14   unchallengeable." *Strickland*, 466 U.S. at 690. Here, defense counsel elicited testimony

15   from Chang about the possibility of cross-contamination.  While trial counsel could have

16   had an expert retest the black jacket and ski mask, it was not unreasonable for counsel

17   to make the professional decision not to.   The tests might have shown that

18   cross-contamination occurred, but they also could have shown there was none.  Further,

19   the tests might have confirmed the presence of Edwards' DNA on the items.  Contrary

20   to Petitioner's assertion, the mere fact that the gloves, mask and hoodie were collected

21   together does not suggest that defense counsel "knew" cross-contamination actually took

22   place.

23        Based on the amount of evidence against Petitioner, it is likely and reasonable that

24   counsel decided not to focus his energies and resources on hiring an expert to challenge

25   the DNA evidence because he reasonably anticipated Petitioner's DNA would be present

26   on the items and a rebuttal expert would be of little help in trying to show otherwise.

27   Given the other strong evidence linking Petitioner to the crimes, including videotapes

28   and witness testimony from Jillian Gomez, Tiffany Brown and others, hiring an expert

1   would have been an unnecessary allocation of resources. Furthermore, even without the
2   use of an expert, defense counsel was able during cross-examination of Cathy Chang to
3   plant some doubt about the reliability of the DNA results by pointing out that cross-
4   contamination was possible. Accordingly, Petitioner has not shown defense counsel's
5   strategy was objectively unreasonable. *See Strickland*, 466 U.S. at 690.

6         Additionally, Edwards has failed to show that he was prejudiced under *Strickland*.
7   Edwards argues that, had an expert testified on his behalf that the DNA evidence was
8   unreliable, the jury would have discredited other evidence, such as Tiffany Brown's
9   testimony. (*See* Pet. at 89, ECF No. 1.) Petitioner merely speculates that the expert
10   would have testified that the DNA evidence was "highly unreliable" and that Edwards'
11   DNA was found on the jacket and ski mask purely because of cross-contamination. (*Id.*
12   at 3, 88.) Without stating more, Petitioner has not overcome his burden to show he was
13   prejudiced by the failure to hire an expert. *See Grisby v. Blodgett*, 130 F.3d 365, 373
14   (9th Cir. 1997) (speculating as to what a proposed expert witness would say is not
15   enough to establish prejudice).

16                  2.     Hotel Room Registration

17         Edwards claims defense counsel was ineffective in failing to present evidence that
18   Edwards was not registered to room 128 of the Best Value Inn, where Gaunce and
19   Edwards were apprehended on June 3, 2009. He points to a copy of a receipt which he
20   claims shows that only Gaunce was registered to room 128. (Pet. at 147, Ex. A, ECF No.
21   1.) Petitioner argues this evidence would have undermined the prosecution's argument
22   that items found inside the motel room, such as the hooded jacket and ski mask,
23   belonged to him. (*See id.* at 44, 95.)

24         At trial, Officer Shannon Martin testified that on June 3, 2009, he and other
25   members of law enforcement were conducting surveillance on the Best Value Inn, in
26   search of Clayton Gaunce and Rashun Mitchell. (Lodgment No. 2, Rep.'s Tr. vol. 3 at
27   287, 289.) He stated he saw Gaunce, who led him to room 128. (*Id.* at 288.) When
28   Martin and other officers approached the room, Edwards was inside, along with several

other individuals. (*Id.* at 287-88.) Officer Martin testified that it was his understanding that both Gaunce and Edwards were registered to the hotel room. (*Id.* at 292.)

Officer Martin's partner, Officer John Hurley, testified that he also entered room 128 after Gaunce led the officers there. (*Id.* at 294.) He stated that he did not check with hotel management to see who the room was registered to because Gaunce and Edwards both told him that they were registered to room 128. (*Id.* at 299.)

Petitioner argues his counsel was ineffective for failing to present a receipt from the Best Value Inn, which shows only Clayton Gaunce as registered to room 128. He argues that had defense counsel shown that Edwards was not registered to the room, he would have not been accountable for items found inside the room, such as the gun, the black jacket and the ski mask. (*See* Pet. at 95, ECF No. 1.)

Edwards has not shown defense counsel's performance was unreasonable. Presenting the receipt as evidence (assuming it could be authenticated) would not have contradicted the testimony of Officers Martin and Hurley. Both stated they based their belief that Edwards was registered to the room on Edwards' own statement. Furthermore, on cross-examination, defense counsel elicited testimony from Officer Hurley that he did not check with the hotel management to confirm the statement. (Lodgment No. 2, Rep.'s Tr. vol. 2 at 299.) Given that Edwards was inside the room when officers arrived, Petitioner has not overcome the "strong presumption" that counsel's conduct fell with the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 686-87.

Further, even if the receipt had been introduced to show Edwards was not registered to the room, there is no reasonable probability the outcome would be different. Edwards was inside room 128 when the officers arrived. (Lodgment No. 2, Rep.'s Tr. vol. 3 at 287-88.) Contrary to Edwards' assertions, a jury could conclude, simply based on his presence in the room, that some of the items found in the room belonged to him. Indeed, a Western Union receipt with Edwards' name on it was found on the desk in the room. (*Id.* at 302-03.) And as discussed above, Edwards was determined to be the major

1 | contributor to the DNA found on the black hooded jacket and ski mask recovered from
2 | the room.   Regardless of whether Edwards was registered to room 128, there was
3 | significant other evidence implicating him in the robberies, as discussed at length above.
4 | Accordingly, Edwards has not shown a reasonable probability the result would have been
5 | different had defense counsel introduced evidence that Edwards was not registered to
6 | room 128.  *See Fretwell*, 506 U.S. at 372.

7 | In sum, Petitioner has not shown defense counsel's performance fell below an
8 | objective standard of reasonableness, or that he was prejudiced as a result. *See*
9 | *Strickland*, 466 U.S. at 688, 694.  The Court recommends claim one be **DENIED**.

10 | **E.    Claim Two:   DNA Evidence**

11 | In his second claim, Edwards argues his due process rights were violated when the
12 | trial court erroneously permitted the DNA evidence to be admitted. (Pet. at 45, ECF No.
13 | 1.)  He claims that "newly discovered evidence" undermines the prosecution's theory
14 | that his DNA was present on the black hoodie jacket and the black ski mask. (*Id.* at 44,
15 | 107.)  Based on this evidence, Edwards contends that he is "actually innocent," and his
16 | conviction is a "fundamental miscarriage of justice."  (*Id.* at 51-52, 114.)

17 | Edwards appears to argue that evidence was mishandled by law enforcement prior
18 | to being sent to the crime lab for analysis, causing cross-contamination. (*Id.* at 46-49.)
19 | He claims the DNA evidence was "improperly handled by Detective Erik Witholt" by
20 | placing the DNA evidence of the black hoodie jacket, ski mask, and knitted gloves inside
21 | of a black backpack with miscellaneous clothing items Petitioner admitted to owning.
22 | (*Id.* at 51.)    Finally, he argues the trial judge erroneously "admitted the cross-
23 | contaminated evidence at the trial without first holding an evidentiary hearing on its
24 | prejudicial effects on a jury." (*Id.* at 52.)  Because Petitioner presented this claim to the
25 | California Supreme Court and it was denied on procedural grounds, the Court reviews
26 | the claim de novo.  *See Chaker*, 428 F.3d at 122; *Lewis*, 391 F.3d at 996.

27 | Petitioner's allegations are largely contradicted by trial testimony. Detective Erik
28 | Witholt testified that he, along with Detective Darrah and others, found and

photographed items seized as evidence from room 128 of the Best Value Inn. (Lodgment No. 2, Rep.'s Tr. vol. 3 at 301.)   Witholt stated he recovered a loaded gun next to the television cabinet (*id.* at 302) and a Western Union receipt with Petitioner's name on it, on the desk. (*Id.* at 302-03). He stated he also found a black hoodie jacket on the floor and, in the pockets of the hoodie, he discovered black gloves and a ski mask. (*Id.* at 303, 305-06.)   Detective Witholt photographed the items as he found them, and those photographs were shown to the jury. (*Id.* at 304.) He reiterated on cross-examination that he found the hoodie on the floor, in the corner of the hotel room. (*Id.* at 305.) He noted that he also found a bag on the floor which contained, among other things, a cell phone bill for Clayton Gaunce. (*Id.* at 307.)

After photographing the items where they were found (*id.* at 304), Witholt transferred the property to Oceanside Detective Bussey for impound.  (*Id.* at 304.) Detective Weese testified that he received the items, including the black hoodie, gloves and ski mask, from Detective Bussey and formally impounded them into evidence. (*Id.* at 370-72.) There is no indication from Detective Witholt's testimony that he or anyone else put the hooded jacket inside a backpack.  Indeed, Cathy Chang testified that when she received the evidence, only the hoodie, gloves and ski mask were packaged together. (Lodgment No. 2, Rep.'s Tr. vol. 3 at 406-07.)

Petitioner points to the testimony of Detective Darrah to support his allegation of evidence tampering. At trial, Detective Darrah identified Exhibit 12, a paper bag marked "evidence," which contained the hooded sweatshirt and three manila envelops which, in turn, separately contained a black glove, another black glove, and a black ski mask. (*See id.* at 199, *see also* Lodgment No. 1, Clerk's Tr. vol. 1 at 133.) The prosecutor asked Detective Darrah to identify a photograph of the knit gloves and another photograph that Detective Darrah seemed unsure of. The following exchange took place:

PROSECUTOR:  And on the lower left picture, what do you see?

DET. DARRAH:  Lower left is going to be – my light is not that great, but I believe it's a black backpack or black jacket. There's a black bag that was found.

| PROSECUTOR: | And the contents of the bag, were they opened up in front of you? |
| DET. DARRAH: | No, they were not. |
| PROSECUTOR: | Did you later submit the contents of the black backpack to the crime lab, San Diego Sheriff's Crime Lab, for DNA Analysis? |
| DET. DARRAH: | Yes, Ma'am. |

(Lodgment No. 2, Rep.'s Tr. vol. 2 at 200-01.)

The prosecutor then asked Detective Darrah about a second hoodie. Darrah testified that two black hoodies were recovered, stating "there was one in the black bag and one I later took from Mr. Gaunce when he was taken into custody, after he was booked into jail." (*Id.* at 202-03.) Later, however, he stated that he was not at the scene when the items were found and had no direct knowledge of where they were found. (*Id.* at 204.)

Contrary to Edwards' claims, no evidence was presented at trial that Detective Witholt placed the hoodie, ski mask and gloves inside the backpack. Detective Witholt stated he found the hoodie on the floor of the room, with the gloves and ski mask in the pockets. Photographs shown the jury depict the black hoodie and backpack lying separately on the floor. Catherine Chang testified that the hoodie, gloves and ski mask were packaged together. She made no mention of the backpack or its contents. Although Detective Darrah stated his belief that the black hoodie was inside the backpack, he admitted that he was not there at the time the items were discovered. Even evidence pointed to by Edwards indicates the hoodie, gloves and ski mask were gathered separately from the backpack and its contents. (*See* Pet. at 180, Ex. I., ECF No. 1.)

To the extent Edwards argues the trial court erred in admitting the DNA evidence without a hearing, it is without merit. On habeas review, admission of evidence by the state court violates due process rights only if the evidence rendered the trial "fundamentally unfair." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Only if there are no permissible inferences that the jury may draw from the evidence can

1  its admission violate due process. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.
2  1991); *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998); *Hovey v.*
3  *Ayers*, 458 F.3d 892, 923 (9th Cir. 2006). The Supreme Court has made "very few
4  rulings regarding the admission of evidence as a violation of due process." *Holley*, 568
5  F.3d at 1101. Specifically, it has never "made a clear ruling that admission of irrelevant
6  or overtly prejudicial evidence constitutes a due process violation sufficient to warrant
7  issuance of the writ." *Id.* Here, the admission of the DNA evidence from the hoodie and
8  ski mask did not render the trial fundamentally unfair. Officer Witholt testified about
9  the collection of the evidence. Cathy Chang stated the hoodie, gloves and ski mask were
10 packaged together.  While she testified that the hoodie and black mask contained
11 Edwards' DNA, she also admitted on cross-examination that cross-contamination was
12 hypothetically possible. The jury was free to weigh the evidence as it saw fit. There was
13 no due process violation. *See Jammal*, 926 F.2d at 920

14     Next, Petitioner's claim that "newly discovered evidence" shows that he is
15 "actually innocent," is without merit.  As an initial matter, Petitioner has not presented
16 any "new" evidence to support his claim. He points almost exclusively to trial testimony
17 that he suggests shows the evidence was tampered with or contaminated.  The only
18 "evidence" he presents to this Court which does not appear to be part of the official
19 record is a copy of Officer Witholt's report and a short excerpt of Edwards being
20 questioned by Detective Darrah.

21     Officer Withold's report is entirely consistent with his trial testimony.  In the
22 report, Witholt lists the items he removed from the hotel room and transferred to the
23 custody of Oceanside Police Detectives for impounding. "Item 10" lists a "black hoodie
24 'Omavi' brand hoodie with one pair black knit glove in left front pocket, and 1 black 3-
25 hole ski mask in right front pocket; found on floor between desk and refrigerator." (Pet.
26 at 180, Ex. I, ECF No. 1.) In item 11, Witholt notes he also collected a "black backpack
27 containing miscellaneous clothing and a cell phone re-charge bill in the name of Clayton
28 Gaunce, located on the floor under items 9 and 10, on floor between desk and

1   refrigerator." (*Id.*)   As for Petitioner's statement to Detective Darrah, which was not

2   admitted at trial, Edwards claimed that he had a "book bag" or "backpack" with

3   toothpaste, a toothbrush and some dirty clothes in room 128. (Pet. at 178, Ex. H, ECF

4   No. 1.)   Nothing about Witholt's report or Edwards' statement is inconsistent with

5   evidence in the record.

6         Moreover, the Supreme Court has never decided whether a habeas petitioner may

7   obtain relief by asserting a freestanding claim of actual innocence. In *Herrera v. Collins*,

8   506 U.S. 390, 400 (1993) ("*Herrera*"), the Court recognized that "[c]laims of actual

9   innocence based on newly discovered evidence have never been held to state a ground

10  for federal habeas relief absent an independent constitutional violation occurring in the

11  underlying state proceeding." The *Herrera* Court assumed, without deciding, "that in

12  a capital case a truly persuasive demonstration of 'actual claim," but ruled that the

13  petitioner in that case had not made such a showing. *Id.* at 417.   In *House v. Bell*, 547

14  U.S. 518 (2006), and more recently in *District Attorney's Office for the Third Judicial*

15  *District v. Osborne*, 577 U.S. 52, 71 (2009), the Court again declined to decide whether

16  federal habeas courts may entertain freestanding claims of actual innocence.[9]

17        Even assuming the existence of a free standing actual innocence claim, to satisfy

18  it, a petitioner must make a "stronger showing than the insufficiency of the evidence to

19  convict" showing adopted by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307

20  (1979). *See Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc ); *see also*

21  *House*, 547 U.S. at 539.   The required showing "'must go beyond demonstrating doubt

22

---

23        [9] Petitioner cites to *Schlup* as support for his claim. (*See* Pet. at 45, 103-04, ECF No. 4).
24  The Supreme Court does permit a habeas petitioner to assert actual innocence as a "gateway"
    claim permitting consideration of an underlying procedurally defaulted constitutional claim, by
    furnishing "'new reliable evidence . . . that was not presented at trial.'"   *See House*, 547 U.S. at
25  537-39 (quoting *See Schlup v. Delo*, 513 U.S. 298, 315 (1995) ("*Schlup*"); ellipses added);
    *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003).   The petitioner must "show that, in light
26  of all available evidence, it is more likely than not that no reasonable juror would convict him
    of the relevant crime." *Smith v. Baldwin*, 510 F.3d 1127, 1140 (9th Cir. 2007) (en banc ) (citation
27  and footnote omitted).   Here, for the reasons discussed in section IV(A) of this Report and
    Recommendation, *Schlup* does not apply because this claim was not procedural defaulted.
28

1    about [the petitioner's] guilt, and must affirmatively prove that he is probably innocent.'"

2    *Boyde v. Brown*, 404 F.3d 1159, 1168 (9th Cir. 2005), amended on other grounds, 421

3    F.3d 1154 (9th Cir. 2005) (quoting *Carriger*, 132 F.3d at 476 (footnote omitted)).

4    Post-conviction evidence serving only to "undercut the evidence presented at trial" does

5    not suffice to meet this standard. *Carriger*, 132 F.3d at 477; *see also Spivey v. Rocha*,

6    194 F.3d 971, 979 (9th Cir. 1999) (habeas relief unavailable where "the totality of the

7    new evidence does not undermine the structure of the prosecution's case").  Here,

8    Petitioner has not shown the DNA evidence was contaminated due to improper evidence

9    collection.  Moreover, even assuming Petitioner could make such a showing, it does not

10    affirmatively prove he is "probably innocent," given the strength of other evidence

11    against him, including testimony from Brown, Gomez and other witnesses, the video

12    surveillance, and other circumstantial evidence.  *See Boyde*, 404 F.3d at 1168.

13         Accordingly, Petitioner has not shown is due process rights were violated by the

14    admission of the DNA evidence. *Holley*, 568 F.3d at 1101. Nor has he shown he is

15    entitled to relief based on "newly discovered evidence" showing that he is "actually

16    innocent." *See Carriger*, 132 F.3d at 476.  The Court therefore recommends claim two

17    be **DENIED.**

18         **F.**     **Ineffective Assistance of Appellate Counsel**

19         In claim three, Petitioner argues he received ineffective assistance of counsel on

20    appeal, in violation of his Sixth Amendment rights.  He claims appellate counsel failed

21    to argue meritorious issues on appeal, in particular that there was insufficient evidence

22    to support his convictions on counts one and two.  (*See* Pet. at 58, 117, ECF No. 1.)

23    Edwards raised this claim for the first time in a petition for writ of habeas corpus to the

24    California Supreme Court (*see* Lodgment No. 9), and it was denied without comment or

25    citation. (*See* Lodgment No. 10.) Because there is no reasoned state court decision, this

26    Court must conduct an independent review of the record to determine if the state

27    supreme court's decision was objectively unreasonable in light of Supreme Court law.

28    *Himes*, 336 F.3d at 853.

1    It is clearly established that "[t]he proper standard for evaluating [a] claim that
2  appellate counsel was ineffective . . . is that enunciated in *Strickland*." *Smith v.*
3  *Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36
4  (1986)). A petitioner must first show that his appellate counsel's performance fell below
5  an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Specifically, a
6  petitioner must show that counsel "unreasonably failed to discover nonfrivolous issues
7  and to file a merits brief raising them." *Smith*, 528 U.S. at 285. He must then show he
8  was prejudiced by counsel's errors. *Strickland*, 466 U.S. at 694. To establish prejudice,
9  Edwards must demonstrate that she would have prevailed on appeal absent counsel's
10  errors. *Smith*, 528 U.S. at 285.

11    The Ninth Circuit has observed that:

12    [Strickland's] two prongs partially overlap when evaluating the
       performance of appellate counsel. In many instances, appellate counsel will
13     fail to raise an issue because she foresees little or no likelihood of success
       on that issue; indeed, the weeding out of weaker issues is widely recognized
14     as one of the hallmarks of effective appellate advocacy. . . . Appellate
       counsel will therefore frequently remain above an objective standard of
15     competence (prong one) and have caused her client no prejudice (prong
       two) for the same reason-because she declined to raise a weak issue.
16

17  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Appealing every arguable issue
18  would do disservice to a client because it would draw an appellate judge's attention away
19  from stronger issues and reduce appellate counsel's credibility before the appellate court.
20  *Id.* at 1428.

21    As discussed above in section IV(C)(2) of this Report and Recommendation, there
22  was more than sufficient evidence to convict Edwards of robbery and personal use of a
23  firearm as to counts one and two. Jillian Gomez identified Edwards as having robbed
24  the Holiday Inn Express and as being the perpetrator armed with a gun. Tiffany Brown
25  testified that Edwards was present for both robberies and she saw him with the gun
26  immediately before and after each one. Brown and Gomez's testimony was corroborated
27  by other witnesses, DNA evidence, and surveillance videos. Given the strength of the
28  evidence against Edwards as to counts one and two, it was neither unreasonable nor

1 prejudicial for appellate counsel to decline to raise those claims on appeal. *See Miller*,
2 882 F.2d at1434. Edwards argues appellate counsel "argued against him" by omitting
3 counts one and two from the appeal and referring to evidence presented by the
4 prosecution to support those counts. (Pet. at 25, ECF No. 1.) Appellate counsel argued
5 that the evidence tying Edwards to counts one and two should not have been used to
6 infer that Petitioner was guilty of counts three and four. (*See* Lodgment No. 13-14.) In
7 making that argument, appellate counsel referred to some of the evidence the prosecution
8 presented to prove counts one and two. (*See id.* at 12.) This was not unreasonable
9 because in order to argue the evidence presented to support the convictions on counts
10 three and four was insufficient, it was necessary for appellate counsel to discuss evidence
11 that the prosecutor relied upon at trial. Nor was it prejudicial because, as discussed
12 above, there was sufficient evidence to support convictions on all four counts. *See*
13 *Smith*, 528 U.S. at 285

14      Finally, Petitioner argues his case was undermined when appellate counsel
15 erroneously stated both Gaunce and Petitioner were registered to the Best Value Inn,
16 room 128. (*See* Pet. at 118, ECF No. 1.) Appellate counsel, however, was merely
17 restating testimony presented at trial. Officer Martin stated that it was his understanding
18 that both Gaunce and Edwards were registered to the hotel (*see* Lodgment No. 2, Rep.'s
19 Tr. vol. 3 at 292) and Detective Hurley testified that both Gaunce and Edwards told him
20 they were registered to room 128. (*Id.* at 299.) Detective Hurley also admitted he did
21 not go to management and see who was actually registered. (*Id.* at 299.) Accordingly,
22 appellate counsel's performance was not objectively unreasonable. *Strickland*, 466 U.S.
23 at 688. Moreover, given the other evidence against Edwards, there is no reasonable
24 probability the outcome would have been different had counsel argued Edwards was not
25 registered to room 128. *Smith*, 528 U.S. at 285.
26 ///
27 ///
28 ///

Based on the forgoing, the state court's denial of Edwards' ineffective assistance of appellate counsel claim was not objectively unreasonable in light of Supreme Court law. *See Himes*, 336 F.3d at 853. The Court recommends claim three be **DENIED**.

### G.     Claim Six: Confrontation Clause

In his sixth claim, Edward's argues his Sixth Amendment right to confront witnesses against him was violated when the trial court permitted evidence related to his former co-defendants to be admitted without making them available for cross-examination. (Pet. at 74-78, 140-144, ECF No. 1.) Specifically, Petitioner claims a photograph of Gaunce taken from Gaunce's cell phone, a hat worn by Mitchell, and an image of Mitchell taken from Mitchell's "MySpace" page were improperly admitted into evidence without an opportunity to cross-examine Gaunce or Mitchell. He also appears to argue that his due process rights were violated because the prejudicial effect of the evidence outweighed any probative value. (*See id.* at 78.) Edwards raised this claim in the California Supreme Court and it was denied on procedural grounds. Therefore, this Court reviews the claim de novo rather than under AEDPA's deferential standard. *See Chaker*, 428 F.3d at 1221; *Lewis*, 391 F.3d at 996.

The Supreme Court has made clear that the Confrontation Clause only applies to the "testimonial" statements of an unavailable witness whom a defendant has no opportunity to cross-examine before trial. *See Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). As the Ninth Circuit has observed, *Crawford's* discussion of what may constitute a testimonial statement was premised on the use of statements "made to a government officer with an eye toward trial, the primary abuse at which the Confrontation Clause was directed." *Jensen v. Pliler*, 439 F.3d 1086, 1089 (9th Cir. 2006). "Although *Crawford* did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an

1  acquaintance does not.'" *Delgadillo v. Woodford*, 527 F.3d 919, 927 (9th Cir. 2008).
2  A hat, a cell phone photograph, and a photographic image taken from a "MySpace" page
3  are neither statements, nor "testimonial." *See Crawford*, 541 U.S. at 51-52 Accordingly,
4  Petitioner's Confrontation Clause claim is without merit.

5      To the extent Edwards argues the prejudicial effect of the evidence so outweighed
6  its probative value as to violate his due process rights, the claim also fails.  The due
7  process inquiry is whether the admission of evidence was arbitrary or so prejudicial that
8  it rendered the trial fundamentally unfair. *Walters*, 45 F.3d at 1357.  Only if there are no
9  permissible inferences that the jury may draw from the evidence can its admission violate
10 due process. *Jammal*, 926 F.2d at 919-20.  In addition, in order to obtain habeas relief
11 on the basis of an erroneous evidentiary ruling, Petitioner must show not only that the
12 error was one of constitutional dimension, but also that it was prejudicial under the
13 standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 113 (1993).  To establish
14 prejudice under *Brecht*, Edwards must establish that the error had "'a substantial and
15 injurious effect' on the verdict.'" *Dillard v. Roe*, 244 F.3d 758, 767 n. 7 (9th Cir. 2001)
16 (quoting *Brecht*, 507 U.S. at 623).

17     The photographs of Gaunce and Mitchell were probative in that they depicted each
18 appearing to wear distinctive hats similar to those described by witnesses to the robberies
19 and seen on surveillance videos. The MySpace image showed Mitchell wearing a black
20 baseball hat with a "P" on it. (Lodgment No. 2, Rep.'s Tr. vol. 3 at 311.)  Mitchell was
21 also wearing a black cap with a "P" on it when he was arrested. (*Id.* at 198.)  The cell
22 phone photograph depicted Gaunce wearing a hat with a red bill and emblem. (*See*
23 Lodgment No. 2, Rep.'s Tr. vol. 2 at 103, 201-202, *see also* vol. 3 at 470.) The
24 photographs and Mitchell's hat were offered as support for the prosecution's theory that
25 Edwards was the gunman in all four robberies based in part on witness testimony and
26 other evidence (including the photographs) that the other two unarmed perpetrators wore
27 distinctive hats and the gunman did not.  The hat and photographs were relevant to the
28 case.  As such, they served a permissible purpose and therefore the admission of the

1  evidence neither violated due process, nor caused prejudice under *Brecht*. *See Jammal*,

2  926 F.2d at 920-21.

3  The Court concludes Petitioner has not shown a violation of the Confrontation

4  Clause, or the Due Process Clause. The Court recommends claim six be **DENIED**.

5  ## H.   Request for an Evidentiary Hearing

6  Edwards asks this Court to conduct an evidentiary hearing on his claims of

7  ineffective assistance of counsel (claim one), erroneous admission of DNA evidence

8  (claim two), and insufficiency of evidence as to counts one and two (claims four). (*See*

9  Motion for Evid. Hrg at 2-3, ECF No. 3; *see also* Supp. Mot. for Evid. Hrg at 6, ECF No.

10  19.) Respondent does not address Petitioner's request.

11  Evidentiary hearings in § 2254 cases are governed by AEDPA, which

12  "substantially restricts the district court's discretion to grant an evidentiary hearing."

13  *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The provisions of 28 U.S.C.

14  § 2254(e)(2) control this decision:

15      (2) If the applicant has failed to develop the factual basis of a claim

16  in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

17      (A) the claim relies on –

18          (i) a new rule of constitutional law, made retroactive to

19  cases on collateral review by the Supreme Court, that was previously unavailable; or

20          (ii) a factual predicate that could not have been

21  previously discovered through the exercise of due diligence; and

22      (B) the facts underlying the claim would be sufficient to establish by

23  clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the

24  underlying offense.

25  28 U.S.C.A. § 2254(e)(2) (West 2006).

26  In order to determine whether to grant an evidentiary hearing, the court must first

27  "determine whether a factual basis exists in the record to support the petitioner's claim."

28  *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at

1078). If not, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* at 669-70. A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000).

A district court's ability to conduct an evidentiary hearing, however, was even more limited by the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. – 131 S.Ct. 1388 (2011). In *Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398. Accordingly, after *Pinholster*, where habeas claims have been decided on their merits in state court, a federal court's review must be confined to the record that was before the state court. *Pinholster*, 131 S. Ct. at 1398.

Here, claim four was presented to the California Supreme Court on habeas review and denied without comment or citation. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S.Ct. at 784-85. Edwards can only proceed to develop additional evidence as to claim four in federal court if either § 2254(d)(1) or (d)(2) are first satisfied. *See Sully v. Ayers*, 725 F.3d 1057, 1076 (9th Cir. 2013) (stating that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief") (citing *Pinholster*, 131 S. Ct. at 1411, n. 20). For all the reasons discussed above in section IV(C)(2) of this Report and Recommendation, Edwards has failed to satisfy § 2254(d) as to claim four. Accordingly, Edwards is not entitled to an evidentiary hearing to develop his claim that there was insufficient evidence to support his convictions on counts one and two. *Id*, 131 S. Ct. at 1398.

As for claims one and two, because they were never adjudicated on the merits in the state court, the *Pinholster* restriction on further evidentiary development does not

apply. *See id.* at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief. . ."); *see also Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) ("[I]f the claim was never 'adjudicated on the merits' in state court, the claim does not fall under 28 U.S.C. § 2254(d) and *Pinholster* does not apply.") Edwards must nonetheless satisfy the requirements of § 2254(e)(2) and show that he was diligent in attempting to develop the record in state court.

The Supreme Court has held that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. 432. To properly present a claim in a California state court, a petitioner is required to "state fully and with particularity the facts on which relief are sought" and "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." *Duvall*, 9 Cal.4th at 474. Although Petitioner did requested an evidentiary hearing in his petition for writ of habeas corpus to the California Supreme Court (*see* Lodgment No. 11 at 47), the court denied the petition with citation to *Duvall*, 9 Cal.4th at 474, indicating that Petitioner failed to meet the minimum pleading requirements. (*See* Lodgment No. 12.) Therefore, Edwards has not shown he was diligent in developing the record in state court. *See Walter v. Clark*, 2010 WL 1643580, *25 (C.D. Cal, Feb. 18, 2010).  As such, Petitioner may receive an evidentiary hearing only if he can meet the narrow exceptions set forth in § 2254(e)(2)(A) & (B). Petitioner does not rely on a new rule of constitutional law, nor does he identify any new facts that could not have been discovered through the exercise of due diligence. Accordingly, Petitioner is not entitled to an evidentiary hearing as to claims one and two. *See Baja*, 187 F.3d at 1079.

For the foregoing reasons, Edwards' request for an evidentiary hearing is **DENIED**.

/ / /

/ / /

## I.    Request for Discovery

Edwards requests discovery of documents and reports related to the collection and DNA testing of the black hoodie jacket, ski mask and black gloves. (*See* Mot. For Evid. Hrg, ECF No. 3 at 3; *see also* Traverse at 40-41, ECF No. 17.)  He argues that a report referred to by San Diego Sheriff's criminalist Cathy Chang will show the items were packaged together and placed inside a black backpack, causing cross-contamination. (*See* Traverse at 40-41, ECF No. 17.)

Rule 6(a) of the Rules Governing § 2254 cases provides that the court may, for good cause, allow discovery and may limit the extent of discovery. Rule 6(b) requires a party requesting discovery to provide reasons for the request, and to specify any requested documents. Unlike civil litigants, a habeas petitioner is not presumptively entitled to discovery.  *See Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir.1999). "Habeas is an important safeguard whose goal is to correct real and obvious wrongs. It was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'"  *Id.* at 1067 (quoting *Calderon v. U.S.D.C. (Nicholaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996)).  "The availability of any discovery during a habeas proceeding is committed to the sound discretion of the district court."  *Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993).  Good cause may be shown "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'"  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)(quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

As discussed above, with regard to claims that were adjudicated on the merits in state court, this Court is limited to facts presented to the state court.  *Pinholster*, 131 S.Ct. at 1398.  Thus, to the extent Edwards seeks discovery to support his claims of insufficient evidence (claims four and five) or ineffective assistance of appellate counsel (claim three), which were adjudicated on the merits in state court, he is not entitled to discovery. *See Runningeagle v. Ryan*, 686 F.3d 758, 773-74 (9th Cir. 2012) (concluding

1   that, under *Pinholster,* the petitioner was not entitled to discovery)*; Ybarra v. McDaniel,*

2   656 F.3d 984, 992 n. 3 (9th Cir. 2011).

3        Furthermore, Petitioner has not shown good cause for discovery as to claims one,

4   two and six, which were not adjudicated on the merits. Based on the record before the

5   Court, there is nothing to suggest that Chang's report or notes would differ in any way

6   from her testimony, which was that the black hoodie, the gloves and the ski mask were

7   packaged together. Petitioner's own exhibit supports Chang's testimony and the

8   testimony of Officer Witholt, that the hoodie, gloves and mask were collected separately

9   from the black backpack. (Pet. at 180, Ex. I, ECF No. 1.) Even if Petitioner could show

10   the items were packaged together, this alone does not show there was cross-

11   contamination. Simply put, none of Edwards' allegations before the Court "show reason

12   to believe that the petitioner may, if the facts are fully developed, be able to demonstrate

13   that he is . . . entitled to relief.'" *See Bracy,* 520 U.S. at 908-09 (quoting *Harris v.*

14   *Nelson,* 394 U.S. 286, 300 (1969)). Accordingly, Petitioner's request for discovery is

15   **DENIED.**

16             **J.**    **Request for Appointment of Expert Witness**

17        Finally, Edwards requests this Court appoint, or provide funding for, an expert

18   witness to re-examine the DNA evidence, pursuant to 18 U.S.C. § 3006A(e)(1). He

19   argues that an expert is necessary to show that there was cross-contamination and as a

20   result the DNA evidence presented at trial was unreliable. (*See* Mot. to Appoint Expert

21   at 4-5, ECF No. 27.) The Criminal Justice Act ("CJA") provides for representation of

22   indigent defendants, *see* 18 U.S.C. § 3006A, and authorizes a district court to appoint

23   counsel to represent a financially eligible habeas petitioner when "the court determines

24   that the interests of justice so require." *Id.* at § 3006A(a)(2)(B). "Counsel for a person

25   who is financially unable to obtain investigative, expert, or other services necessary for

26   adequate representation may request them in an ex parte application." *Id.* at

27   § 3006A(e)(1). The plain language of the statute "necessarily contemplates that

28   'counsel' is the person who may request funding for investigative services, and that, in

I:\Everyone\_R\FILE-PROSE\K3C\14cv0428-R.RR.wpd, 4115                14cv0429

1  turn, suggests that counsel must first have been appointed under § 3006A before the
2  court will consider authorizing funding for investigative services." *Covarrubias v.*
3  *Gower*, 2014 WL 342548, *1 (N.D. Cal. Jan. 28, 2014).   Because Petitioner is
4  proceeding on habeas pro se, he is not entitled to funds to hire an expert.  Furthermore,
5  this Court has already denied Petitioner's requests for an evidentiary hearing and
6  discovery and therefore hiring an expert would be futile. *See id.* at *2 ("A reasonably
7  competent counsel would not retain an investigator to develop evidence that cannot be
8  presented to or considered by the court.")  The Court **DENIES** Petitioner's request for
9  appointment of an expert witness.[10]

10  **V.   CONCLUSION AND RECOMMENDATION**

11      The Court submits this Report and Recommendation to United States District
12  Judge John A. Houston under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the
13  United States District Court for the Southern District of California.  For the reasons
14  outlined above, the **DENIES** Petitioner's request for an evidentiary hearing, **DENIES**
15  his request for discovery, and **DENIES** his request for appointment of an expert witness.

16      In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an Order:
17  (1) approving and adopting this Report and Recommendation, and (2) directing that
18  Judgment be entered **DENYING** the Petition.

19      **IT IS HEREBY ORDERED** that any party to this action may file written
20  objections with the Court and serve a copy on all parties ***no later than May 4, 2015***.  The
21  document should be captioned "Objections to Report and Recommendation."

22

23

---

24      [10]   To the extent Edwards' request could be liberally construed as a request for
appointment of counsel, it is DENIED.  The Sixth Amendment right to counsel does not extend
25  to federal habeas corpus actions by state prisoners.  *McCleskey v. Zant*, 499 U.S. 467, 495
(1991);  *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).  However, financially eligible
26  habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may obtain representation
whenever the court "determines that the interests of justice so require." 18 U.S.C.
27  § 3006A(a)(2)(B); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1181 (9th Cir. 1990).  In the present
case, for all the reasons discussed above, the Court finds the interests of justice do not require
28  appointment of counsel.

1   **IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with

2   the Court and served on all parties ***no later than May 18, 2015***. The parties are advised

3   that failure to file objections within the specified time may waive the right to raise those

4   objections on appeal of the Court's Order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th

5   Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

6   **DATED:** April _1_, 2015

7

8

9                                    **Hon. Karen S. Crawford**
                                     **United States Magistrate Judge**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28